THE NORWALK VAULT COMPANY OF BRIDGEPORT, INC., ET AL. *v.* THE MOUNTAIN GROVE CEMETERY ASSOCIATION

DONALD BROWNE EX REL. THE NORWALK VAULT COMPANY OF BRIDGEPORT, INC., ET AL. *v.* THE MOUNTAIN GROVE CEMETERY ASSOCIATION

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued January 16—decision released May 20, 1980

*Lawrence J. Merly,* with whom was *Richard T. Meehan, Jr.,* for the appellants (plaintiffs in each case).

*Dion W. Moore,* with whom was *Frederick L. Comley,* for the appellee (defendant in each case).

COTTER, C. J.   These consolidated cases were instituted on behalf of eight vault manufacturing companies, a burial vault manufacturers' association, six funeral directors, two funeral director associations, and two private individuals who own plots located in the cemetery property owned by the defendant Mountain Grove Cemetery Association (hereinafter Mountain Grove).   The complaints in

both actions contain identical allegations that the defendant is engaged in the sale, for profit, of burial vaults and that such activity is "unlawful, unreasonable and against public policy," for the alleged reasons, inter alia, that the defendant's activity is prohibited by General Statutes § 20-230 and is beyond its corporate charter. In the first action, the plaintiffs seek money damages and an injunction enjoining any further sales of burial vaults by the defendant. The second action is in the nature of quo warranto challenging the authority under which the defendant claims the propriety of its burial vault sales activity and seeking the forfeiture of the defendant's charter and the dissolution of its corporate existence.[1] From the judgment rendered in favor of the defendant on the complaint in each of these cases, the plaintiffs have appealed.[2]

Mountain Grove was organized in 1849 as a private enterprise for cemetery purposes. In 1889, it was organized, by Special Act No. 231, as a nonstock corporation, open to the public, with the "right

[1] In view of the fact that the two private individual plaintiffs, as owners of lots in the defendant cemetery, clearly have standing to maintain these suits, we do not reach the issue of whether the remaining plaintiffs also possess standing.

[2] In each of these cases, the defendant filed a counterclaim alleging that several of the plaintiffs combined and conspired to unreasonably restrain commerce in violation of 15 U.S.C. §§ 1 and 2 (Sherman Act) and §§ 35-26 and 35-27 of the General Statutes. The trial court rendered judgments on the counterclaims in favor of the plaintiffs and no appeal therefrom has been taken by the defendant. Instead, the defendant moved to open the judgments on the counterclaims on the ground that the issues contained therein had been severed from the trial on the plaintiffs' complaints and were therefore not properly before the court for the rendition of judgment. The defendant's motion to open the judgments has not been acted upon by the trial court and the issues presented in the counterclaims are accordingly not presently before this court.

to acquire and to hold lands for the purpose of a cemetery." 10 Spec. Acts 1049, No. 231. The cemetery now has in excess of 125 acres of land, seventeen of which remain unused, and possesses the right of eminent domain to acquire additional land. General Statutes §§ 19-147 and 48-18. Mountain Grove receives its gross income from various sources including the sale of lots, tent fees, charges for digging graves, securities, operation of a crematory, the sale of crypts or niches in its mausoleum and columbarium and the sale of urns, mausoleum face plates, flowers and bronze markers.

Although not required by statute, cemetery regulations require that all caskets be enclosed in a non-perishable vault or casket container for earth interment. See *Dries* v. *Charles Evans Cemetery Co.,* 109 Pa. Super. 498, 167 A. 237 (cemetery regulation providing that vaults required for burial be made of either brick, stone, or concrete held to be a reasonable exercise of the cemetery's charter powers). The use of burial vaults prevents the collapse of the grave upon the decomposition of the body and the casket and thus enables the cemetery to properly maintain the lots and preserve the aesthetic quality of the grounds. Burial vaults are usually acquired through funeral directors who show prospective purchasers samples, or mock-ups, of various vault styles from which to choose, and when the decision is made as to which vault is to be utilized, the funeral director contacts the vault manufacturer and places an order for that vault. This transaction is treated as if the funeral director sold the vault inasmuch as the director makes a profit and must pay sales tax on that sale. The manufacturer then delivers the vault to the cemetery for installation in the grave prior to the funeral

service. Following the service, the casket is lowered into the vault which is then covered and usually sealed. Burial vaults have not always been obtained through funeral directors but are sometimes sold directly to cemeteries and, in fact, in the 1920s, Mountain Grove itself sold vaults.

In 1975, Mountain Grove sought to offer an alternative form of below ground burial utilizing a vault called a double depth lawn crypt. A double depth lawn crypt is a single unit in which two caskets are placed, one on top of the other, separated by a shelf.[3] In the traditional single vault burial, only one casket may be placed in a vault. Bids were sought from various vault manufacturers, including the plaintiff Norwalk Vault Company of Bridgeport, Inc., (hereinafter Norwalk Vault) for the purchase and installation of double depth lawn crypts at Mountain Grove. Alexander Pirozzoli, president of Norwalk Vault, purportedly expressing the opinion of the three plaintiff associations, declined to offer a bid as requested by Mountain Grove stating that, in his belief, it would be "contrary to existing law for cemeteries to engage in the sale of funeral merchandise."[4]

Mountain Grove eventually purchased 128 double depth crypts from a vault manufacturer in Pennsylvania which were all installed en masse. The instal-

---

[3] This method of burial should be distinguished from the double depth burial, also allowed in one section of the cemetery, where two single vaults, each containing a single casket, are installed, one on top of the other, in the same grave.

[4] The evidence indicated that this reason for refusing to sell double depth lawn crypts to Mountain Grove was given despite the fact that counsel for the Connecticut Burial Vault Manufacturers Association had earlier advised that the burial vaults are not funeral merchandise and that Norwalk Vault had been selling vaults to cemeteries for ten years.

lation was accomplished by excavating an area of approximately one acre and constructing therein a drainage system of pipes and washed gravel. Along the perimeter of the excavated area, organic tile was installed. This drainage system is necessary to remove the water that would seep into the crypt while the crypt remains unsealed until both caskets are placed in it. There is a vent at the bottom of the crypt through which the water flows out of the crypt and is carried away by the drainage system. The crypts were installed side by side on top of the washed gravel, one and one-half inches apart, so as to tie them into the drainage system, and the area was then backfilled with topsoil and reseeded. For a burial utilizing a double depth crypt, the cemetery needs only to remove eighteen inches of soil above the crypt, lift the cover of the crypt, and the interior shelf if the lower level is going to be occupied, and lower the casket into the crypt. By the time of the trial, Mountain Grove had sold seventeen or eighteen graves containing double depth crypts and the profits from those sales had been placed in a fund for the maintenance of the cemetery.

The plaintiffs contend that a double depth burial crypt is personal property which is not necessary or proper for the operation and maintenance of the cemetery and that the sale of such crypts is therefore not within the mandate of Mountain Grove's charter[5] and in violation of General Statutes § 20-230. The defendant maintains that the crypt is affixed to the realty and that only the use of the space within the crypt is conveyed to the lot owner

---

[5] Section 3 of Mountain Grove's charter provides, in pertinent part, that Mountain Grove shall have the right "to buy and sell such articles of personal property as may be necessary or proper for the operation and maintenance of the cemetery, columbarium and mausoleum." 34 Spec. Acts 23, No. 17 § 3.

which conveyance is authorized by its charter. We agree with the conclusion of the trial court that the double depth burial crypts, by reason of their annexation to the realty, had, upon their installation, become fixtures and that the conveyance of a gravesite containing a crypt was within Mountain Grove's power to hold and convey cemetery property.

As noted previously, Mountain Grove's charter authorizes it to "acquire and to hold lands for the purpose of a cemetery." The plaintiffs recognize that if deemed a fixture, a double depth burial crypt installed in the grave is conveyed as a part of the conveyance of that burial plot which is clearly within the mandate of the defendant's charter. Unable to challenge the trial court's conclusion on the basis of the method of installation of the crypts, the plaintiffs vigorously attack the conclusion that the crypts were intended to become permanently annexed to the realty.

The character of the property being conveyed to a lot holder is to be ascertained as of the date when it is annexed to the realty. *Cleaveland* v. *Gabriel*, 149 Conn. 388, 391, 180 A.2d 749; *Lesser* v. *Bridgeport-City Trust Co.*, 124 Conn. 59, 63, 198 A. 252. Whether these crypts may be characterized as personal property in other situations, as, for example, in a dispute between a vault manufacturer and a funeral director or between a funeral director and a vault purchaser, is irrelevant in the present case. The relevant issue is the nature of the property being conveyed to a lot holder.

To constitute a fixture, it is essential "that an article should not only be annexed to the freehold,

but that it should clearly appear from an inspection of the property itself, taking into consideration the character of the annexation, the nature and the adaptation of the article annexed to the uses and purposes to which [the realty] was appropriated at the time the annexation was made, and the relation of the party making it to the property in question, that a permanent accession to the freehold was intended to be made by the annexation of the article." *Capen* v. *Peckham,* 35 Conn. 88, 94; *Merritt-Chapman & Scott Corporation* v. *Mauro,* 171 Conn. 177, 182, 368 A.2d 44; *Giuliano Construction Co.* v. *Simmons,* 147 Conn. 441, 443, 162 A.2d 511; *Tolles* v. *Winton,* 63 Conn. 440, 28 A. 542; *Barnes* v. *Burt,* 38 Conn. 541; *Alvord Carriage Mfg. Co.* v. *Gleason,* 36 Conn. 86. The plaintiffs argue that all burials are intended to be permanent but the vault is not therefore transformed into a fixture simply by reason of the burial since industry custom permits the removal of a sealed single depth vault upon a disinterment. Whatever may be the lot holder's intent regarding the removal of single depth vaults is not applicable to double depth crypts. Even were we to consider the plaintiffs' representation as to the custom of the industry, which was not found by the trial court, that custom is irrelevant in view of the trial court's finding that if disinterment of a deceased buried in a double depth crypt becomes necessary or desirable, the casket will be removed from the crypt and placed in another vault for transportation. The double depth crypt, however, would remain installed in the grave and the space made vacant upon the removal of the casket would be available for another occupant. The plaintiffs do not point to any testimony from a purchaser of a double depth crypt that clearly establishes an intent

that the crypt is to be removed upon disinterment. Indeed, pragmatically, unless both caskets placed in a double depth crypt are to be disinterred, the crypt would have to remain installed in the grave in order to accommodate the remaining casket.

In addition, the instrument by which the burial plots containing double depth crypts are conveyed clearly indicates that title to the vault is not conveyed to the lot holder. That document recites that the cemetery "does hereby grant, bargain, sell and convey unto the said [purchaser] and to his heirs and assigns forever, the right and privilege *to use for burial purposes Lawn Crypt Space #       ."* (Emphasis added.) This conveyance comports with the rule recognized as early as 1905 in *State* v. *Scoville,* 78 Conn. 90, 61 A. 63, that "one receiving from a cemetery association a deed of a burial lot does not thereby take a title to the soil itself" but acquires the right "to a limited use of particular lots for purposes of interment . . . subject to the reasonable police regulations of the association having charge of the cemetery. The association may be regarded as holding the fee in trust for the purposes for which the corporation was organized." Id., 94. See also 14 Am. Jur. 2d, Cemeteries § 25, p. 732. Indeed, with regard to burial lots in general, the cemetery is authorized to convey only the use of the lot and to employ whatever instrument to effect that conveyance it deems appropriate.[6]

---

[6] Section 6 of the Mountain Grove charter provides in pertinent part: "The lots in the cemetery of said association, the receptacles, crypts and niches in the columbarium and mausoleum of said association shall be assured to the holders thereof by a certificate or deed executed in such form as the directors shall prescribe *and the title to the use thereof* may be transferred in such manner as the directors may direct . . . ." (Emphasis added.)   34 Spec. Acts 23, No. 17 § 6.

The plaintiffs urge that the charter not be construed to permit the challenged activity engaged in by Mountain Grove for the reason that the conveyance of a cemetery lot in which double depth crypts are installed is against the public policy of this state. The plaintiffs argue that by reason of the installation of double depth crypts, the cemetery has acquired an exclusive selling privilege regarding burial vaults inasmuch as a holder of a lot containing a double depth crypt is precluded from using any other vault in that grave.[7] Whatever privileges exist regarding those crypts are necessarily incidental to the privilege of conveying burial plots and it is well established that the state may confer that latter privilege upon certain organizations, to the exclusion of others, through statutes regulating the location of cemeteries. *Laurel Hill Cemetery* v. *San Francisco,* 216 U.S. 358, 30 S. Ct. 301, 54 L. Ed. 515; *Holy Sepulchre Cemetery* v. *Greece,* 191 Misc. 241, 79 N.Y.S.2d 683, aff'd 273 App. Div. 942, 79 N.Y.S.2d 863; 14 Am. Jur. 2d, Cemeteries § 10, p. 709. See also *A. W. Carlson, Inc.* v. *Judd,* 133 Conn. 74, 48 A.2d 269 (a cemetery regulation forbidding the use, on cemetery property, of tents or canopies other than ones furnished by the cemetery was held

---

[7] The plaintiffs rely on *People* v. *Bloomington Cemetery Assn.,* 353 Ill. 534, 187 N.E. 455, in which the court invalidated a cemetery regulation which forbade the use, in all burials in the cemetery, of vaults that were not acquired from the cemetery. Recognizing the cemetery's power to prescribe reasonable regulations relative to burials, the court nonetheless held that the "right of exclusive sale of grave-boxes is not a necessary incident to the powers expressly granted by the association's charter." Id., 539. Cf. *State* v. *Lakewood Cemetery,* 197 Minn. 501, 267 N.W. 510 (The cemetery was authorized to manufacture and sell vaults, which were for the exclusive use of its lot holders where the cemetery did not prohibit a lot owner from acquiring a vault for use in the cemetery from some other source). It is unclear in either of these cases whether the vaults in question had been installed in the grave prior to the sale.

to be a reasonable exercise of its charter powers notwithstanding the fact that it granted to the cemetery an exclusive privilege in furnishing tents and canopies). In order to secure permanent care, the legislature permits cemetery associations to exist with the duty of providing, maintaining and protecting burial grounds. *Connecticut College* v. *Calvert,* 87 Conn. 421, 88 A. 633. By limiting double depth crypts to one section of the cemetery, the defendant in fact increases the available alternative burial methods. Unlike the cases relied on by the plaintiffs, where all burials in the cemetery needed to utilize vaults acquired from the cemetery, a prospective purchaser is not limited solely to the double depth crypt, but may, if a grave in another part of the cemetery is chosen, obtain a vault from any dealer the purchaser desires.[8] In view of the nature of the installation and the intent, as found by the trial court, that the double depth crypts are permanently annexed to the realty even upon disinterment of the deceased buried therein, we conclude that the trial court correctly determined that the crypts are fixtures[9] which are conveyed as part of the cemetery

---

[8] The plaintiffs' remaining arguments concerning violations of public policy as a result of the defendant's activities were addressed in *State ex rel. Willow Monument Works* v. *Mountain Grove Cemetery Assn.,* 168 Conn. 447, 362 A.2d 1341, where they were resolved in favor of the cemetery.

[9] The fact that these double depth crypts are deemed fixtures does not imply that all vaults installed as part of the burial service necessarily become fixtures and therefore property of the cemetery. Although the vault is intended to remain in the grave for as long as the deceased remains there, if it is shown that the vault was intended to be removed upon disinterment of the deceased, then the intent that the vault be permanently affixed, which is present in this case, would be missing. Similarly, a casket lowered into a vault would not become a fixture.

realty and therefore within the authority established in Mountain Grove's charter.[10]

Since we decide that the charter permits the defendant to install double depth burial crypts and convey them, as part of the realty, to its lot holders, which is dispositive of the case, we need not consider whether, as argued by the plaintiffs, those crypts are funeral merchandise within the prohibition of General Statutes § 20-230.[11]    That section, having been enacted prior to the 1969 Special Act; 34 Special Acts 23, No. 17; which enacted the current charter, has been impliedly repealed to the extent it prohibits the activity found to be authorized by the charter. *New Haven Water Co.* v. *North Branford,* 174 Conn. 556, 565, 392 A.2d 456.

There is no error.

In this opinion the other judges concurred.

---

[10] In view of our conclusion that double depth burial crypts are conveyed to lot holders as part of the realty, there is no need to consider the plaintiffs' alternative argument that the sale of the crypts is not authorized by that portion of section 3 of the charter concerning personal property.  See *State ex rel. Willow Monument Works* v. *Mountain Grove Cemetery Assn.,* 168 Conn. 447, 456, 362 A.2d 1341, where, in construing the term "proper" in § 3 of Mountain Grove's charter, the court held that the sale of bronze markers by the cemetery to lot holders was proper for the operation and maintenance of the cemetery.

[11] "[General Statutes] Sec. 20-230.  BUSINESS NOT TO BE CONDUCTED IN CEMETERY OR ON TAX-EXEMPT PROPERTY.  No person, firm, association or corporation shall engage in the business of funeral directing, except in continuing the supervision of a funeral, or in the profession of embalming or the sale of funeral merchandise in or on any cemetery or tax-exempt property."